John Fenton **WHEELER**, Plaintiff,

v.

**CENTRAL INTELLIGENCE AGENCY,** et al., Defendants.

No. CIV.A.02–604 RMC.

United States District Court, District of Columbia.

June 4, 2003.

James Hiram Lesar, Washington, DC, for plaintiff.

Sherri Evans Harris, U.S. Attorney's Office, Washington, DC, for defendants.

### MEMORANDUM OPINION

COLLYER, District Judge.

This is an action instituted under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and the Privacy Act, 5 U.S.C. § 552a, concerning the response John Fenton Wheeler received to the request for documents he submitted to the Central Intelligence Agency ("CIA" or "Agency").[1] Mr. Wheeler sought "a copy of any records about me maintained at your agency." Compl. Ex. 3. In a letter dated May 4, 2000, the CIA responded that there were "no documents available to [him] under either the FOIA or the Privacy Act of 1974." Compl. Ex. 9 (citations omitted). "By such language, the Agency neither confirmed nor denied the existence or nonexistence of records responsive to [Mr. Wheeler's] request."[2] Decl. of Wil-

---

**1.** Mr. Wheeler also submitted a request to the Federal Bureau of Investigation ("FBI") for "all records on or per-taining [*sic*] to him." Compl. Ex. 1. The FBI is not a party to the instant motion.

**2.** This is commonly referred to as a "Glomar" response, named after a salvage ship called the "Glomar Explorer."

liam H. McNair ("McNair Decl.") ¶ 6. The letter informed Mr. Wheeler that he could "construe this as a denial on the basis of FOIA exemptions (b)(1) and (b)(3) and Privacy Act exemptions (j)(1) and (k)(1)." *Id.* (referring to 5 U.S.C. § 552(b)(1), (b)(3) and 5 U.S.C. § 552a(j)(1), (k)(1)). Frustrated by this lack of information, Mr. Wheeler filed this lawsuit.

The CIA has moved for summary judgment, which Mr. Wheeler opposes.[3] He seeks to compel the CIA to make specific searches for documents, to conduct discovery, to have the Court review any documents relevant to his request *in camera,* and to receive partial summary judgment in his favor. For the following reasons, the Court will grant the CIA's motion, deny Mr. Wheeler's motion for summary judgment and to compel, and dismiss the complaint.[4]

## I. BACKGROUND

### A. John Fenton Wheeler

Mr. Wheeler was an Associated Press ("AP") correspondent in Cuba from February 13, 1967, to September 8, 1969, when the Cuban government expelled him from the country. He and his wife were escorted by Cuban security aboard a Cubana de Aviacion plane bound for Mexico City. Also on the plane was Humberto Carillo, a former press aide at the Mexican embassy in Havana whom the Cuban government had formally accused of spying for the CIA. Mr. Wheeler was told that his reporting on the Carillo matter and his "hostile campaign against Cuba" caused his expulsion.[5]

Decl. of John Fenton Wheeler ("Pl.Decl.") ¶ 2. When Mr. Wheeler arrived in Houston from Cuba, he was advised by AP's president and general manager that the CIA and FBI wanted to talk to him. Mr. Wheeler had no desire to speak with either agency and apparently did not do so.

Mr. Wheeler attests that a Cuban defector, Francisco Antonio Teira Alfonso, later testified to the Senate Judiciary Committee's Subcommittee on Internal Security about him. Mr. Alfonso told the Subcommittee that Cuban President Castro was very interested in proving that Mr. Wheeler either had been a CIA agent or had been co-opted by the CIA. Mr. Alfonso also said that a superior of his in Cuba's Directorate of State Security had directed him to frame Mr. Wheeler.

From November 1969 until September 1982, Mr. Wheeler was the bureau chief of AP for Spain and Portugal. In this role, he had two small (and unsuccessful) contacts with a CIA station chief in efforts to obtain information for AP.

### B. The CIA's FOIA Process

"The CIA is charged with collecting, processing, analyzing, producing and disseminating foreign intelligence and counterintelligence, and performing other functions and activities related to intelligence affecting the national security as the President or the National Security Council may direct." McNair Decl. ¶ 12. Not surprisingly, the CIA receives a vast number of FOIA requests. According to Mr. McNair, who is the Information Review

---

**3.** Mr. Wheeler submitted a motion for leave to file late his reply brief in support of his motion for partial summary judgment and to compel. That motion will be granted.

**4.** Mr. Wheeler previously moved to compel both the CIA and the FBI to prepare *Vaughn* indices. *See Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973). On November 14, 2002, the Court ordered the Department of Justice to

make such a filing on behalf of the FBI. Because the Court will ultimately dismiss the CIA from this lawsuit, Mr. Wheeler's motion to compel a *Vaughn* index from the CIA will be denied as moot.

**5.** In 1967, while he was a correspondent in Havana, Mr. Wheeler wrote a story about a plot, allegedly supported by the CIA, to assassinate Fidel Castro.

Officer for the Directorate of Operations at the CIA, when the CIA receives a FOIA request for documents about a subject area, it searches its files and produces all records that are not exempt under the statute. *See id.* ¶ 10. "In this typical circumstance, the CIA's answer, either to provide or not provide the records sought, actually confirms to the requestor (and the world, for that matter) the existence or nonexistence of such CIA records." *Id.*

Requests for records about specific individuals are handled differently. Person-specific information is neither confirmed nor denied, and is not revealed in any manner by the Directorate of Operations, unless there has already been "an acknowledged overt connection" between the individual and the CIA. *Id.* ¶ 13. "[T]he CIA could not make a practice of disclosing the existence (or not) of only those files pertaining to persons not having a clandestine relationship, since that would render any non-confirming response a tacit admission of the existence of the very clandestine relationship [it] must keep secret." *Id.* ¶ 17.

The CIA claims that, if it were to reveal whether it possessed or did not possess records on a particular individual, FOIA could be used to alert hostile forces to the fact of CIA observation or the CIA's inability to penetrate their cover. *See id.* ¶¶ 19, 20. In the face of multiple person-specific FOIA requests, a foreign intelligence service—or anyone else—could discern which persons might be CIA collaborators. According to the CIA, such information would "greatly aid in eliminating the CIA's network in that country." *Id.* ¶ 21. It would also jeopardize the lives and safety of any individuals—and their families—who were previously willing to cooperate with the CIA. *See id.* ¶ 17 ("Covert cooperation with U.S. intelligence is an inherently dangerous venture. Individuals put a great deal

at risk by cooperating with CIA officers."). Moreover, release of "the areas and persons of CIA interest would indicate to [a] target how the CIA is allocating its resources," affording the target the opportunity to "array its counterintelligence and security resources most efficiently to frustrate the CIA." *Id.* ¶ 22.

## II. LEGAL STANDARDS

### A. Summary Judgment

■ "In a suit brought to compel production [of records], an agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced ... or is wholly exempt from [FOIA's] inspection requirements.'" *Students Against Genocide v. Dep't of State,* 257 F.3d 828, 833 (D.C.Cir.2001) (quoting *Goland v. CIA,* 607 F.2d 339, 352 (D.C.Cir.1978)). A district court conducts a *de novo* review of an agency's determination to withhold information under FOIA or the Privacy Act. *See* 5 U.S.C. § 552(a)(4)(B); 5 U.S.C. § 552a(g)(3)(A). Additionally, the agency bears the burden of sustaining its decision to claim an exemption from disclosure. *Id.*

■ "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe 'the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Miller v. Casey,* 730 F.2d 773, 776 (D.C.Cir.1984) (quoting *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C.Cir.1981)). The court is to "'accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record[,]'" *Military Audit Project v. Ca-*

*sey*, 656 F.2d at 738 (quoting S. REP. NO. 93–1200, 93d Cong. (2d Sess.1974), *reprinted in* 1974 U.S.C.C.A.N. 6290 (emphasis added)), and should remain "[m]indful that [it has] little expertise in either international diplomacy or counterintelligence operations, [and thus is] in no position to dismiss the CIA's facially reasonable concerns." *Frugone v. CIA*, 169 F.3d 772, 775 (D.C.Cir.1999).

## B. Exemptions

■ Classified information that has been properly designated as secret is exempt from disclosure under FOIA Exemption (b)(1), 5 U.S.C. § 552(b)(1), and Exemption (k)(1) of the Privacy Act, 5 U.S.C. § 552a(k)(1).[6] FOIA Exemption (b)(1) protects information that is "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and ... [is] in fact properly classified pursuant to such Executive order[.]" Exemption (k)(1) of the Privacy Act allows the head of any agency to promulgate rules to prevent the disclosure of any system of records that is subject to 5 U.S.C. § 552(b)(1). The Director of Central Intelligence ("DCI") has promulgated 32 C.F.R. § 1901.63(a) to exempt classified information from disclosure under the Privacy Act.

Sections 1.5(c) and 1.5(d) of Executive Order 12,958 authorize the classification of information that concerns intelligence activities, sources, methods, or foreign relations. Pursuant to section 1.2(a)(4) of the Executive Order, information in these categories may be classified when the appropriate original classification authority determines that unauthorized disclosure reasonably could be expected to cause

damage to the national security in a manner that the classification authority is able to identify and describe.[7] Further, section 3.7(a) of the Executive Order provides that "an agency may refuse to confirm or deny the existence or nonexistence of requested information whenever the fact of its existence or nonexistence is itself classified ...." Exec. Order No. 12,958, 60 Fed.Reg. 19,825 (Apr. 17, 1995). The CIA's published FOIA regulations implement this aspect of the Executive Order:

> [T]he Agency shall decline to confirm or deny the existence or nonexistence of any responsive records whenever the fact of their existence or nonexistence is itself classified under Executive Order 12958 or revealing of intelligence sources and methods protected pursuant to section 103(c)(5) of the National Security Act of 1947.

32 C.F.R. § 1900.21(c).

■ FOIA Exemption (b)(3) applies to information that is "specifically exempted from disclosure by statute ...." 5 U.S.C. § 552(b)(3). To constitute a "withholding statute" under this exemption, a statute must "require[ ] that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or ... establish[ ] particular criteria for withholding or refer[ ] to particular types of matters to be withheld[.]" *Id.* The CIA relies for its withholding in this case on the National Security Act of 1947 and the Central Intelligence Agency Act of 1949. *See CIA v. Sims*, 471 U.S. 159, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985). Section 103(c)(7) of the National Security Act directs the DCI to "protect intelligence sources and methods from unauthorized disclosure[.]" 50

---

6. These two provisions track each other, so that the fundamental question is whether the requested information is exempt under FOIA.

7. According to Mr. McNair's affidavit, he holds original classification authority at the TOP SECRET level. *See* McNair Decl. ¶ 3.

U.S.C. § 403–3(c)(7). Under section 403g of the Central Intelligence Agency Act, the CIA is exempted from "the provisions of any ... law which require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency ...." 50 U.S.C. § 403g.

The CIA states that Exemption (j)(1) of the Privacy Act "is a corollary to FOIA exemption (b)(3)." Def. Mem. of Law in Supp. of Def. CIA's Mot. for Summ. J. at 4. Exemption (j)(1) of the Privacy Act authorizes the head of an agency to promulgate rules to exempt a system of records within the agency if that system is maintained by the CIA. The DCI has implemented this exemption by promulgating 32 C.F.R. § 1901.62(d)(1), which protects information that would "[c]onsist of, pertain to, or otherwise reveal intelligence sources and methods[.]"

## III. ANALYSIS

The CIA has moved for summary judgment because "no agency records have been improperly withheld from [Mr. Wheeler.]" Def. Mem. of Law in Supp. of Def. CIA's Mot. for Summ. J. at 3. It asserts that whether responsive documents even exist is classified and, therefore, protected from disclosure by FOIA Exemption (b)(1) and Exemption (k)(1) of the Privacy Act.[8] In addition, the CIA characterizes Mr. Wheeler's request as seeking information on intelligence sources and methods, as well as the names and official titles of personnel employed by the CIA. Under the National Security Act of 1947 and section 403g of the Central Intelligence Agency Act of 1949, it contends, such information may be withheld under FOIA Exemption (b)(3) and Exemption (j)(1) of the Privacy Act.

In his opposition brief and cross motion, Mr. Wheeler argues that he is entitled to take discovery as to the basis for the CIA's position that it cannot be required either to confirm or deny the existence or nonexistence of responsive records, as well as the procedures by which it arrived at that position. He also attacks the CIA's claims under FOIA Exemptions (b)(1) and (b)(3). Finally, Mr. Wheeler argues that the CIA has not shown that it conducted an adequate search of its operational and non-operational files.

### A. Discovery

Mr. Wheeler cites *Phillippi v. CIA,* 546 F.2d 1009 (D.C.Cir.1976), in support of his bid for discovery. In that case, Harriet Ann Phillippi, a journalist, filed a FOIA request for CIA records documenting attempts by the Agency to persuade the media not to publish events relating to the activities of the "Glomar Explorer," a ship allegedly owned and operated by the United States government. The CIA denied her request on two grounds: it claimed that (i) any responsive records that might exist would be classified, and (ii) the existence or nonexistence of records would relate to information pertaining to intelligence sources and methods, which is protected from disclosure under 50 U.S.C. § 403(d)(3). In a subsequent lawsuit, Ms. Phillippi moved to require the CIA to provide a detailed justification for each document for which it claimed an exemption. The CIA countered with a motion to dismiss or for summary judgment. After reviewing two sealed affidavits, the district court granted the Agency's motion. On appeal, the D.C. Circuit examined whether the CIA should have been required to support its position on the basis of the public record. The Court of Appeals held

---

**8.** The classified fact in this case is "whether or not the CIA had a covert or clandestine intelligence relationship with or interest in Plaintiff." Def. Mem. of Law in Supp. of Def. CIA's Mot. for Summ. J. at 8.

that, when the CIA neither confirms nor denies the existence of requested records, it must "provide a public affidavit explaining in as much detail as possible the basis for its claim . . . ." 546 F.2d at 1013. The Court of Appeals continued, "The Agency's arguments should then be subject to testing by [the FOIA requester], who should be allowed to seek appropriate discovery *when necessary* to clarify the Agency's position or to identify the procedures by which that position was established." *Id.* (emphasis added).

Mr. Wheeler poses several questions in his brief concerning the CIA's position that he feels warrant discovery. For example, he wants to know how long the Agency has taken this position and whether it has ever disclosed information on an individual as to whom there had been no prior official acknowledged connection. Mr. Wheeler sees inconsistencies in the CIA's handling of his request and its release of information to Carl Oglesby in a separate case. *See Oglesby v. Dep't of Justice,* Civ. Action No. 02–0603(RWR), Defendants' Status Report to the Court (D.D.C. June 24, 2002) (CIA determined "that a file with the number 201-785942 was once maintained by the CIA's Directorate of Operations. However, CIA records indicate that this file was destroyed on June 13, 1991 . . . . [T]he CIA does not retain information about the subject matter of its files after they have been destroyed."). Specifically, Mr. Wheeler suggests that "the CIA recently disclose[d] [*sic*] . . . the fact that it had created a '201' file on Carl Oglesby . . . ." He contends that he should be able to conduct discovery into this discrepancy.

 Discovery is generally unavailable in FOIA actions. *See Judicial Watch, Inc. v. Export-Import Bank,* 108 F.Supp.2d 19, 25 (D.D.C.2000). The CIA's position is at least as old as its published FOIA regulations. *See* 32 C.F.R.

§ 1900.21(c). Mr. Wheeler has not shown bad faith on the part of the CIA or any substantive difference in the CIA's handling of the two FOIA requests such that bad faith should be inferred. The file in *Oglesby* reveals that the CIA released information to Mr. Oglesby in 1975. There is no indication, however, whether the existence or nonexistence of records on Mr. Oglesby had received official overt acknowledgment at that point in time. Moreover, the mere acknowledgment in 2002 of the destruction of a file with the number 201-785942 (without mention of its *actual* contents) does not contradict Mr. McNair's declaration. Thus, any variation in the CIA's handling of these two FOIA requests—at least on the record before this Court—does not present a sufficient basis for ordering discovery.

### B. FOIA Exemption (b)(1)

 Mr. Wheeler makes three challenges to the CIA's reading of its authority to withhold records under Executive Order 12,958 and FOIA Exemption (b)(1). First, he argues that the Executive Order only provides that an agency "may" refuse to confirm or deny the existence or non-existence of records and that it does not require withholding. Since it is not the CIA's position that the Executive Order requires it to refuse to confirm or deny the existence of records on Mr. Wheeler, this argument is not persuasive.

Mr. Wheeler also argues that the CIA overreaches when it declares that the cooperation of human intelligence sources with the CIA must "forever remain secret." *See* McNair Decl. ¶ 14; *Keenan v. Dep't of Justice,* Civ. Action No. 94–1909(GK), Mem. Op. at 11 (D.D.C. Mar. 24, 1997) ("This Circuit holds a strong presumption against prolonged withholding of information whose sensitivity may have diminished with age."). He adds that the

CIA made "massive disclosures regarding [its] operations against Cuba made under the President John F. Kennedy Assassination Records Collection Act of 1991" and that it has not shown any subsequent harm to national security interests. Pl. Opp. to Mot. of Def. CIA to Dismiss or for Summ. J. at 6. Therefore, according to Mr. Wheeler, "[i]n light of the great volume of disclosures regarding the CIA's operations against Castro in the 1960s that already has been made, it is not credible, absent some very special circumstances, that additional disclosures will significantly harm national security." *Id.* at 7.

The Court rejects the argument that intelligence from or about Cuba in 1969 is *per se* too ancient to warrant continued withholding in 2003. *See Keenan,* Mem. Op. at 11 (The "passage of time alone is not a per se bar to Exemption 1 claims, so long as the agency provides a sufficiently detailed and persuasive affidavit that adequately demonstrates the national security concerns covered under the applicable Executive Order."). Mr. McNair's affidavit has detailed the reasons for the CIA's position with great clarity and persuasion. At base, Mr. Wheeler finds problematic the CIA's discretionary judgment that it cannot confirm or deny the existence or nonexistence of records concerning himself. Yet, "[t]he decisions of the [DCI], who must, of course, be familiar with the whole picture, as judges are not, are worthy of great deference given the magnitude of the national security interests and the potential risks at stake." *Knight v. CIA,* 872 F.2d 660, 664 (5th Cir.1989), *cert. denied,* 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 474 (1990) (quoting *Sims,* 471 U.S. at 179, 105 S.Ct. 1881); *see Frugone v. CIA,* 169 F.3d at 775.

Lastly, Mr. Wheeler argues that Exemption (b)(1) does not apply because Cuba already knows that the CIA has recruited Cuban nationals for counter-intelligence work. He laughs at Mr. McNair's statement that release of such information could adversely affect the United States' foreign relations.[9] Mr. Wheeler misses the point with this argument. While the Court assumes that Cuba "knows" in some way that the CIA has had an interest in working with Cuban nationals, it also recognizes that some of the collaborators, past and present, may remain unidentified. In the interest of protecting these individuals and their families—if they exist[ed]—and the CIA's methods of operating, the Agency has fully explained its reasons for refusing to confirm or deny the existence or nonexistence of the requested records. As explained by a fellow district judge:

> A confirmation that information about plaintiff exists would, in essence, be an admission of the identity of a CIA intelligence interest. A denial ... would allow interested parties to ascertain the nature of CIA intelligence interests based on their analysis of patterns of CIA answers in different FOIA cases. Therefore, the Court finds that defendant CIA properly invoked FOIA exemption [ (b)(1) ] to justify its refusal to confirm or deny the existence of records regarding plaintiff.

*Nayed v. INS,* 1993 WL 524541, **2–3, 1993 U.S. Dist. LEXIS 16962, at *7–*8 (D.D.C. Nov. 29, 1993) (citations omitted).

## C. FOIA Exemption (b)(3)

 The CIA's reliance on FOIA Exemption (b)(3) and section 103(c)(7) of the

---

9. *See* Pl. Opp. to Mot. of Def. CIA to Dismiss or for Summ. J. at 8 ("The fact that the foreign country concerned is Cuba renders this solemn asseveration risible, if not downright comical. God forbid that Cuba[ ] should get the idea that the CIA has 'collected information on or recruited one of its nationals.' ").

National Security Act of 1947, which protects "intelligence sources and methods" from unauthorized disclosure, is also assailed by Mr. Wheeler. He argues that the Agency has failed to show that the information being withheld "can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods." *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C.Cir.1982) (quoting *Halperin v. CIA*, 629 F.2d 144, 147 (D.C.Cir.1980) (internal quotation marks omitted)); *Military Audit Project v. Casey*, 656 F.2d at 736–37. Instead, he contends, given the amount of information already released about CIA activities in Cuba, it is reasonable to conclude that most, if not all, of the CIA's methods have already been disclosed. This argument fails in the face of the details of McNair's declaration and the deference given to the Agency to determine what information must be withheld for national security purposes. *See Miller v. Casey*, 730 F.2d 773, 777–78 (D.C.Cir. 1984) ("Courts are required to grant the same deference to agency determinations of whether national security could be injured as they grant to classification decisions ... [and] are obligated to accord substantial weight to the agency affidavit."). Obviously, Mr. Wheeler disagrees with the decisions made by the CIA; but, his disagreement, however well-based, does not undercut the reasonable and persuasive rationale provided by the Agency. The DCI is required to protect intelligence sources and methods from unauthorized disclosure. *See* 50 U.S.C. § 403–3(c)(7). As the Court noted in *Nayed*, "an answer to plaintiff's request reasonably could be expected to lead to unauthorized disclosure of an intelligence method." 1993 WL 524541, *2, n. 5, 1993 U.S. Dist. LEXIS 16962, at *8 n. 5.

### D. Adequacy of the CIA's Search

The CIA's response to Mr. Wheeler's FOIA and Privacy Act requests did not identify whether or to what extent it had conducted a search of its operational or non-operational files. Mr. Wheeler argues that the CIA has an obligation to search both kinds of files, submit whatever is located—if anything—to the Court for *in camera* inspection, and then allow the Court to determine whether either of the claimed exemptions applies. In furtherance of this process, Mr. Wheeler asserts that he needs to engage in discovery concerning the CIA's organizational structure, filing systems, and search methodologies so that the Court can determine whether the search itself was adequate. He also asserts that he needs to conduct discovery into the CIA's "Glomar" response and the basis for its claim that any responsive records must be classified. *See supra*, Section III.A.

 The Court declines the offer of discovery assistance. It agrees with the CIA that the adequacy of a search is irrelevant to this "Glomar" response because the issue is whether the Agency has given sufficiently detailed and persuasive reasons for taking the position that it will neither confirm nor deny the existence or non-existence of any responsive records. "When the Agency's position is that it can neither confirm nor deny the existence of the requested records, there are no relevant documents for the court to examine other than the affidavits which explain the Agency's refusal." *Phillippi v. CIA*, 546 F.2d at 1013. "When the agency meets its burden by means of affidavits, *in camera* review [of records] is neither necessary nor appropriate." *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C.Cir.1979); *see Nayed v. INS*, 1993 WL 524541, *3, 1993 U.S. Dist. LEXIS 16962, at *9 ("Because defendant CIA properly refused to confirm or deny the existence of records ... the Court need

not examine whether the search was adequate.").

## IV. CONCLUSION

For the reasons stated above, and based upon the entire record herein, the Court will grant the motion for summary judgment filed by the CIA and deny Mr. Wheeler's motion for partial summary judgment as to the CIA's "Glomar" response and to compel. A separate order accompanies this memorandum opinion.

## *ORDER*

For the reasons stated in the memorandum opinion that accompanies this order, it is hereby

**ORDERED** that Plaintiff's motion to compel preparation of a *Vaughn* index by the CIA [7] is **DENIED.** It is

**FURTHER ORDERED** that Defendant CIA's motion for summary judgment [9] is **GRANTED.** It is

**FURTHER ORDERED** that Plaintiff's motion for partial summary judgment and to compel [26] is **DENIED.** It is

**FURTHER ORDERED** that Plaintiff's motion for leave to file late his reply brief in support of his motion for partial summary judgment and to compel [39] is **GRANTED.** It is

**FURTHER ORDERED** that the complaint is DISMISSED against Defendant CIA.

**SO ORDERED.**